LOVELADIES PROPERTY OWNERS ASS'N., INC., A COR-
PORATION OF THE STATE OF NEW JERSEY, JOINT
COUNCIL OF TAXPAYERS ASSOCIATIONS OF SOUTH-
ERN OCEAN COUNTY, INC., A CORPORATION OF THE
STATE OF NEW JERSEY AND LONG BEACH ISLAND
CONSERVATION SOCIETY, A CORPORATION OF THE
STATE OF NEW JERSEY, PLAINTIFFS-APPELLANTS, v.
MAX RAAB AND DAVID BARDIN, COMMISSIONER OF
ENVIRONMENTAL PROTECTION, STATE OF NEW
JERSEY, DEFENDANTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued October 14, 1975—Decided November 10, 1975.

Before Judges CARTON, CRAHAY and HANDLER.

*Mr. Stephen B. Patrick* argued the cause for appellants.

*Mr. Garry J. Roettger* argued the cause for respondent Max Raab (*Hiering, Grasso, Gelzer & Kelaher,* attorneys).

*Mr. Arnold Lakind,* Deputy Attorney General argued the cause for respondent Commissioner of Environmental Protection (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney; *Mr. Stephen Skillman,* Assistant Attorney General, of counsel).

The opinion of the court was delivered by

HANDLER, J. A. D. Plaintiffs Loveladies Property Owners Ass'n, Inc., the Joint Council of Taxpayers Associations of Southern Ocean County, Inc. and the Long Beach Island Conservation Society brought this action seeking a declaration that certain lands owned by defendant Max Raab in Long Beach Township were wetlands under the Wetlands Act of 1970, *N. J. S. A.* 13:9A–1 *et seq.,* and an injunction restraining Raab from depositing fill on those lands. The action also sought an order compelling defendant Com-

missioner of the Department of Environmental Protection to require Raab to cease all fill operations and to restore his lands to their previous condition. Both defendants filed alternative motions for dismissal or summary judgment.

The essential facts were that the lands owned by Raab were designated wetlands on a map properly filed by the Commissoner on September 21, 1972. Between October 26, and December 5, 1972 Raab filled part of those wetlands with clean fill. (While plaintiffs originally contended that these filling operations continued into January 1973, they were unable to prove this or create a genuine issue of fact as to the date upon which the filling operation was completed or terminated.) On January 10, 1973 the Commissioner promulgated an order which requires a permit for all filling on the land in question.

The court adopted the position of the Commissioner as to the interpretation of the Wetlands Act of 1970, particularly that the promulgation of an appropriate wetlands order is a predicate or precondition to the requirement for a permit. Accordingly, summary judgment was granted in favor of defendants.

The Wetlands Act of 1970 became effective on November 5, 1970. The act directs the Commissioner of the Department of Environmental Protection to make an inventory and map all tidal wetlands within New Jersey. *N. J. S. A.* 13 :9A–1 (b). The law further provides that:

The commissioner may from time to time * * * adopt, amend, modify or repeal orders regulating, restricting or prohibiting, dredging, filling, removing or otherwise altering, or polluting, coastal wetlands. [*N. J. S. A.* 13 :9A–2]

There is a prohibition against engaging in a "regulated activity" upon any wetland without first obtaining a permit. *N. J. S. A.* 13 :9A–4 (b). The term "regulated activity" is defined to include :

\* \* \* draining, dredging, excavation or removal of soil, mud, sand, gravel, aggregate of any kind or depositing or dumping therein any rubbish or similar material or discharging therein liquid wastes, either directly or otherwise, and the erection of structures, drivings of pilings, or placing of obstructions, whether or not changing the tidal ebb and flow. [*N. J. S. A.* 13:9A–4(a)]

Plaintiffs' position, as we understand it, is that no kind of "regulated activity" could be conducted with respect to wetlands without first obtaining a permit, and that the necessity for such a permit is not obviated by the failure of the Commissioner to have filed a wetlands map or promulgate a proscriptive order under the act. A "regulated activity," as plaintiffs argue, is one which requires a permit pursuant to *N. J. S. A.* 13:9A–4 and would cover any conceivable action touching or affecting wetlands, including "filling"; it would be any activity intended by the Legislature to be governed by the act, regardless of whether the particular activity is one specifically itemized as a regulated activity in *N. J. S. A.* 13:9A–4 or alluded to more generally under *N. J. S. A.* 13:9A–2, or elsewhere in the act. In effect, according to plaintiffs, the permit requirement as a precondition for any such activities is obligatory under the statute and not the subject of administrative discretion otherwise contemplated by the act.

An inescapable implication of this thesis is that *N. J. S. A.* 13:9A–2, which provides for discretionary action and regulation by the Commissioner as to certain kinds of activities, which are rather broadly set forth, is superfluous. This is so because there would be no activities within the expansive reach of *N. J. S. A.* 13:9A–2 which would not also be covered by the enumeration of regulated activities under the non-discretionary provisions of *N. J. S. A.* 13:9A–4.

There is a more logical and sensible construction of the statute. *N. J. S. A.* 13:9A–4 was intended to prescribe the mode of regulation or permit procedure which is to be followed in cases of all activity intended by the Legislature

to be regulated under the act. The administrative regulation thus contemplated by the act entails the issuance of a prior order under *N. J. S. A.* 13:9A–2 and 3. While the class of governed activities of *N. J. S. A.* 13:9A–2 is more general, and not as extensively listed as those of *N. J. S. A.* 13:9A–4, the broad areas of activity encompassed by the two sections appears to be substantially similar, if not identical. *N. J. S. A.* 13:9A–4, which enumerates what kinds of activity are subject to regulation, defines "regulated activity" in illustrative and expansive language (*i. e.,* "includes but is not limited to * * * .") 2A *Sutherland, Statutory Construction* (Sands ed. 1973) § 47.17 at 103. To the extent that the difference in expression was intended, it is sensible to construe *N. J. S. A.* 13:9A–4 as illustrative of the activities reached by the act as a whole, which is stated in the general terminology of *N. J. S. A.* 13:9A–2. Thus, we are satisfied that the act contemplates that any activity subject to regulation as affecting covered wetlands is not prohibited unless and until the Commissioner has filed a wetlands map and promulgated an appropriate order pursuant to which a permit may issue upon application. See *Sands Point Harbor, Inc. v. Sullivan,* 136 *N. J. Super.* 436 (App. Div. 1975).

Other provisions of the Wetlands Act of 1970 support the interpretation that administrative action is required before the statutory prohibition can be applied. Pursuant to *N. J. S. A.* 13:9A–3 the Commissioner, as a predicate to adopting a wetlands order, is directed to "hold a public hearing thereon in the county in which the coastal wetlands *to be affected* are located * * *." (Emphasis supplied). Similarly, the timing of judicial review "within 90 days after receiving notice [of an order or permit]," *N. J. S. A.* 13:9A–6, indicates that it is the wetlands order and not the act itself which triggers the statutory restriction of regulated activities. Moreover, the Superior Court is given jurisdiction with respect to "violations of orders issued pursuant to [the] Act." *N. J. S. A.* 13:9A–5.

[2] It was also the position of the State on the motion below, as well as on this appeal, that in the actual implementation of the law the Commissioner, since the enactment of the Wetlands Act of 1970, has construed it to exempt from the permit requirement all "regulated activities" completed prior to the effective date of the pertinent wetlands order. The intricacy of the statutory definition of "coastal wetlands," coupled with the broad scope of "regulated activities," and the administrative burden of classifying wetlands on a case by case basis, are strong, practical reasons for the position that enforcement of the act by permits for regulated activities is dependent upon the prior mapping of wetlands and the promulgation of a wetlands order. This contemporaneous and practical interpretation and application of the law by the Commissioner, the administrative officer charged with the implementation of the act, is accorded great weight. *Lloyd v. Vermeulen,* 22 *N. J.* 200, 210 (1956); *Nat'l Org. for Women v. Little League Baseball, Inc.,* 127 *N. J. Super.* 522, 530 (App. Div. 1974); *cf. In re West New York,* 25 *N. J.* 377, 385–386 (1957).

Support for this construction may also be drawn from the statement of Governor Cahill in approving the bill, *viz:*

After completing the map and inventory of a particular area, the Commissioner shall comply with the Act's requirements of public notices and hearing before adopting any orders. Until orders for a particular area become effective, after the mapping and hearings, development may proceed without Departmental approval.

Consideration of such statements may be appropriate in ascertaining legislative intent. *Cf. Irval Realty v. Bd. of Pub. Util. Commissioners,* 61 *N. J.* 366 (1972).

During oral argument counsel for plaintiffs raised for the first time a contention that the Wetlands Act of 1970 intended to distinguish between two different kinds of wetlands, *i. e.,* tidal wetlands mentioned in *N. J. S. A.* 13: 9A–1(b) and coastal wetlands as defined in *N. J. S. A.* 13:

9A-2. The former section provides that the Commissioner shall make an inventory and maps of all "tidal wetlands" within the State and that the boundaries of such wetlands shall "generally define the areas that are at or below high water." Counsel now urges that this section refers only to "tidal wetlands" and not "coastal wetlands", and that mapping is not a prerequisite to the effectiveness of the permit requirements of *N. J. S. A.* 13:9A-4 with respect to coastal wetlands. While counsel in making this belated argument apparently conceded that prior mapping of "tidal wetlands" was a prerequisite to the regulation of such tidal wetlands, he contended that with respect to "coastal wetlands" the act became immediately effective and self-operative on the date of its passage, November 5, 1970, since, under his hypotheses, the act contains no requirement that coastal wetlands be mapped.

The Wetlands Act of 1970 carefully and separately defines the meaning of "coastal wetlands" as

* * * any bank, marsh, swamp, meadow, flat or other low land subject to tidal action * * * [within a certain geographical area] * * * or any inlet, estuary * * * whose surface is at or below an elevation of 1 foot above local extreme high water, and upon which may grow or is capable of growing * * * [a number of types of vegetation] * * *. [*N. J. S. A.* 13:9A-2]

The term "tidal wetlands", defined in general terms under *N. J. S. A.* 13:9A-1 for the purpose of mapping, necessarily includes a portion of wetlands which would be considered coastal. It does not appear that the Legislature intended to exempt such lands from the mapping and other regulatory requirements of the act. Indeed, the Commissioner is required to file "a plan of the lands affected" by orders regulating coastal wetlands, by specific reference to filed wetlands maps "on which the same are shown". *N. J. S. A.* 13:9A-3. And the full title of the act itself underscores its predominant purpose to protect all coastal wetlands, which encompasses those defined as tidal wetlands.

Further reflecting this evident purpose, we are advised by the Attorney General that the wetland maps which have been filed by the Commissioner delineate all wetlands and specifically designate by reference to types of vegetation those which are coastal wetlands.

Accordingly, for all of the reasons set forth we affirm the judgment below.